UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BS BIG V, LLC, BHC BIG V, LLC, and BHRA BIG V, LLC,<br><br>               Plaintiffs,<br><br>   -v-<br><br>PHILADELPHIA INDEMNITY INSURANCE COMPANY,<br><br>               Defendant. | CIVIL ACTION NO.: 19 Civ. 4273 (GBD) (SLC)<br><br>**REPORT AND RECOMMENDATION** |

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE GEORGE B. DANIELS**, United States District Judge:

## I.  INTRODUCTION

Plaintiffs BS BIG V, LLC, BHC BIG V, LLC, and BHRA BIG V, LLC ("Big V") brought this action asserting a breach of contract claim against Defendant Philadelphia Indemnity Insurance Company ("PIIC") based on PIIC's failure to indemnify Big V for water damage to property that Big V owned and PIIC insured.  (ECF No. 1-1 ¶¶ 8–15 (the "Complaint")).  Now before the Court are PIIC's motions to exclude BIG V's expert, Rudi Sherbansky ("Sherbansky"),[1] pursuant to Federal Rule of Evidence 702 and <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), (ECF No. 38 (the "Daubert Motion")), and for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 35 (the "MSJ", with the Daubert Motion, the "Motions")).  The Honorable George B. Daniels, United States District Judge, referred the Motions for a report

---

[1] Throughout the record, Sherbansky's name is spelled differently.  (<u>Compare</u> ECF No. 39-2 at 13 <u>with</u> ECF No. 36-7 at 1).  The Court opts to spell it as Sherbansky signs it at ECF No. 39-2 at 13.

and recommendation.  (ECF No. 32).  For the reasons set forth below, I respectfully recommend that the Daubert Motion be DENIED and the MSJ be DENIED.

## II.  BACKGROUND

### A.  Factual Background[2]

#### 1.  PIIC's Insurance Policy

PIIC issued to Big V policy number PHPK1836038 for the policy period June 30, 2018 through June 30, 2019 (the "Policy")).  (ECF Nos. 41; 41-1; <u>see</u> ECF No. 37-1 ¶ 4).  The Court excerpts several provisions of the Policy pertinent to the Motions.

#### a.  Covered Causes of Loss

In the event of a "loss," the Policy provides:

**A. Covered Causes of Loss**

**Covered Causes of Loss** means Risks of Direct Physical Loss unless the **"loss"** is:

---

[2] The Court's factual summary is drawn from: PIIC's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 37-1 ("PIIC 56.1")); Big V's Response to Defendant's Rule 56.1 Statement of Material Facts and Counterstatement of Material Facts (ECF No. 47-11 ("Big V 56.1")); PIIC's Response to Big V's Rule 56.1 Counterstatement of Facts (ECF No. 50 ("PIIC Counter 56.1")); the Declaration of Christopher T. Bradley in Support of PIIC's Motion for Summary Judgment and exhibits thereto (ECF No. 36 ("Bradley MSJ Decl."); the Declaration of Sean F. McAloon in Opposition to PIIC's Motion for Summary Judgment and exhibits thereto (ECF No. 47-1 ("McAloon MSJ Decl.")); the Declaration of Christopher T. Bradley in Support of PIIC's Daubert Motion and exhibits thereto (ECF No. 39 ("Bradley Daubert Decl.")); and the Declaration of Sean F. McAloon in Opposition to PIIC's Daubert Motion and exhibits thereto (ECF No. 46-1 ("McAloon Daubert Decl.")).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited in support.  Where a fact stated in the movant's Rule 56.1 Statement is supported by evidence but denied by a non-conclusory statement by the non-movant, the Court finds such fact to be true.  <u>See</u> Loc. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically converted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); Loc. Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

1. Limited in Section **B., Exclusions**;

…

**B. Exclusions**

…

2.We will not pay for **"loss"** caused by or resulting from any of the following:

…

f. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air-conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the **"buildings"**; or
(2) You drain the equipment and shut off the supply if the heat is not maintained.

…

3. We will not pay for **"loss"** caused by or resulting from any of the following. But if **"loss"** by a Covered Cause of Loss results, we will pay for that resulting **"loss."**

…

c. Faulty, inadequate or defective:
(1) Planning, zoning, development, surveying, siting;
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance;
Of part or all of any property on or off the described premises.

(ECF No. 41-1 at 7–11; see ECF No. 37-1 at 2–3 ¶ 5).  Big V acknowledges that the Policy excludes

losses "caused by faulty workmanship or faulty construction," but contends that the Loss

(see § II.A.2, infra) was nevertheless a "resulting" Covered Cause of Loss.  (ECF No. 36-14 at 2).

**b.   Valuation**

The Policy also contains the following "Valuation" provision:

**7.Valuation**

We will determine the value of Covered Property in the event of **"loss"** as follows:

a.  At replacement cost (without deduction for depreciation) as of the time of **"loss"**, except as provided in **b., c., d., e., f., g.,** and **h.** below.

(1)  We will not pay more for **"loss"** on a replacement costs basis than the least of:

    (a)The Limit of Insurance applicable to the lost or damaged property;

    (b) The cost to replace the lost or damaged property with other property;

        (i) Of comparable material and quality; and

        (ii) Used for the same purpose; or

    (c) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(2) We will not pay on a replacement cost basis for any **"loss"**:

    (a)  Until the lost or damaged property is actually repaired or replaced; and

    (b)  Unless the repairs or replacement are made as soon as reasonably possible after the **"loss"**.

If the repairs or replacement are not made as soon as reasonably possible after the **"loss"**, the value of the property will be actual cash value.

(ECF No. 41 at 140).

### c.   Loss Payment

The third provision of the Policy pertinent to the Motions is the following "Loss Payment"

provision:

**4. Loss Payment**

…

    **a.** In the event of **"loss"** to Covered Property covered by this Coverage form, at our option, we will either:

        (1) Pay the value of lost or damaged property;

        (2) Pay the cost of repairing or replacing the lost or damaged property;

        (3) Take all or any part of the property at an agreed or appraised value; or

        (4) Repair, rebuild or replace the property with other property of like kind and quality.

        . . .

    **c.**  We will not pay you more than your financial interest in the Covered Property.

(ECF Nos. 37-1 at 11 ¶ 50; 41 at 138–39).  The Policy also specifies Big V's duties in the event of

loss:

**3. Duties in the Event of Loss**

a. You must see that the following are done in the event of **"loss"** to Covered Property:

. . .

>    (5) At our request, give us complete inventories of the damaged and undamaged property, including quantities, costs, values and amount of **"loss"** claimed.
>    (6) As often as may be reasonably required, permit us to inspect the property and records proving the **"loss"**.
>
>    Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(ECF Nos. 37-1 at 11–12 ¶ 51; 41 at 138).

### d.  Vacancy

The final provision pertinent to the Motions is the Policy's "Vacancy" provision:

**6. Vacancy**

> If the **"building"** where **"loss"** occurs has been vacant for more than 60 consecutive days before that **"loss,"** we will:
>
> a.  Not pay for any **"loss"** caused by any of the following even if they are Covered Causes of Loss:
>
> >    (1) Vandalism;
> >    (2) Sprinkler leakage, unless you have protected the system against freezing;
> >    (3) Building glass breakage;
> >    (4) Water damage;
> >    (5) Theft; or
> >    (6) Attempted theft.
>
> b.  Reduce the amount we would otherwise pay for the **"loss"** by 15%.
>
> **"Buildings"** are vacant when they do not contain enough business personal property to conduct customary operations.

(ECF No. 41 at 139–40).

### 2. __The Building and the Loss__

The property subject to the Policy was a single-story freestanding building (the "Building") located in New Windsor, New York that had once contained a branch of Orange County Bank & Trust (the "Bank"). (ECF Nos. 36-6 at 2; 37-1 at 4 ¶ 5;[3] 41 at 11). The Building was constructed in 2001, and in 2014, Big V purchased the Building and assumed the lease with the Bank. (ECF Nos. 36-1 at 129; 36-6 at 2; 37-1 at 4 ¶¶ 6–7). In late 2017, the Bank vacated the Building. (ECF Nos. 36-1 at 73; 37-1 at 4 ¶¶ 5, 8).

On December 19, 2018, after having been vacant for a year, a rupture in a pipe supplying water to a heating, ventilation, and air conditioning ("HVAC") system located in the attic of the Building resulted in water damage to fixtures and furnishings the Bank had left behind in the Building (the "Loss"). (ECF Nos. 36-1 at 85, 146–47; 37-1 at 4 ¶¶ 10–11). On December 19, 2018, Big V submitted a claim to PIIC under the Policy for the Loss. (ECF Nos. 47-7 at 1; 37-1 at 4 ¶ 11[4]; 47-3 at 6–7).

### 3. __PIIC's Investigation__

To adjust the Loss, PIIC retained MSW Adjustment Group ("MSW"). (ECF Nos. 37-1 at 5 ¶ 12; 41-2; 47-11 at 5 ¶ 2). On December 26, 2018, MSW inspected the Building, (ECF No. 47-11 at 5 ¶ 3), and, on December 28, 2018, issued a report concluding that:

> At the time of inspection, we could confirm that a plumbing supply pipe break occurred at the location . . . The broken section of the pipe was not visible. The HVAC equipment appears to be installed in the attic of the location. No attic access was found. To determine if the loss is due to an atypical pipe break, or possibly

---

[3] PIIC's 56.1 contains two paragraphs numbered "5"; this citation is to the second paragraph "5." (See ECF No. 37-1 at 2–4).

[4] PIIC's 56.1 contains two paragraphs numbered "11"; this citation is to the second paragraph "11". (See ECF No. 37-1 at 4).

> due to freeze, per your direction we assigned an engineer to
> inspect the location. The ceilings in the location are damaged
> beyond repair. We therefore have advised the public adjuster to
> have the ceilings removed prior to our engineering inspection. Our
> office hopes all mitigation would be completed prior to this
> inspection.

(ECF No. 41-2 at 5 (the "MSW Report"); see ECF No. 47-11 at 6 ¶¶ 4–5).

PIIC's adjuster, Susan Sabouni, testified that, subsequently, PIIC directed MSW to cancel the assignments to the engineers because PIIC "had a pretty clear vacancy exclusion" that supplied grounds to deny coverage under the Policy. (ECF Nos. 47-4 at 16; 47-11 at 6 ¶ 6). On January 10, 2019, PIIC issued a letter denying Big V's claim based on the "Vacancy" provision. (ECF Nos. 47-7 (the "Jan. 10 Denial"); 47-11 at 6 ¶ 7). Ms. Sabouni testified that, at the time of the Jan. 10 Denial, PIIC did not "know what caused the pipe to break[.]" (ECF Nos. 47-4 at 17; 47-11 at 7 ¶ 8). PIIC subsequently discovered, however, that it had failed to attach a "Vacancy Permit" to the Policy, which would have allowed for coverage when the Building was vacant. (ECF Nos. 47-4 at 23–24; 47-11 at 7 ¶ 9). PIIC thus rescinded the Jan. 10 Denial. (ECF Nos. 47-4 at 24–25; 47-11 at 7 ¶ 9).

PIIC then retained EDT Forensic Engineering & Consulting ("EDT") to determine the cause of Loss. (ECF Nos. 36-6 at 2; 37-1 at 5 ¶ 14). James B. Davis ("Davis"), a licensed professional engineer, inspected the Building on January 31, 2019 and issued a report on February 6, 2019. (ECF Nos. 36-6 (the "EDT Report"); 37-1 at 5 ¶ 14; 47-11 ¶ 12). Davis reported that, at the time of his inspection, "[t]he interior of the [B]uilding had been gutted[.]" (ECF No. 36-6 at 2). Davis observed that "[a] water supply pipe . . . is routed through an uninsulated attic space" where the HVAC units were located. (Id. at 3). He observed that, "[a]lthough pipe insulation is utilized within the uninsulated attic space, portions of the water supply pipe are not covered by the pipe

insulation . . . thus exposing the pipe to the ambient temperature of the uninsulated attic space."
(Id.)  As to the water damage, Davis found that "[t]he water supply pipe [which supplied water
to the humidifiers to the HVAC units] was separated at an elbow joint . . . within the insulated
attic space, consistent with damage resulting from freezing of water within the pipe."  (Id.)  Davis
observed that "[w]eather records indicate that sub-freezing temperatures occurred in the New
Windsor, New York area on December 18, 2018 and December 19, 2018."  (Id.)  He speculated
that, due to the vacancy of the Building, "the heat within the [B]uilding, if on, was kept at a
minimal temperature (often cited as 55˚F)."  (Id.)  Davis concluded that "[t]he separation of a
pipe joint along a water supply pipe of the [] [B]uilding was the result of water freezing within
the pipe on, or about, December 19, 2018."  (Id.)

Utility records indicate that, during December 2019, the Building was not heated and the
water supply to the Building remained on, "with the result that the HVAC pipes were full of
standing water."  (ECF No. 37-1 at 6 ¶ 19; see ECF No. 36-9).  Weather records for the New
Windsor area indicate that on December 8–13, 2018 and December 18–19, 2018, the average
temperature was at or below freezing.  (ECF No. 36-10 at 3).  On December 19, 2018, the average
temperature was 28˚F, and reached a low temperature of 17˚F.  (Id.; ECF No. 37-1 at 6 ¶ 21).
Maintenance records for the HVAC unit indicate that "the HVAC had no prior history of pipe
breaks, water discharges, or leaks of any kind."  (ECF Nos. 37-1 at 7 ¶ 25; 36-12 at 2).

On February 19, 2019, PIIC issued a letter to Big V denying coverage for the Loss.
(ECF Nos. 37-1 at 6 ¶ 22; 41-3 at 3 (the "Feb. 19 Denial"); 47-11 at 7 ¶ 13).  Citing paragraph B.2.f
of the Policy ("Paragraph 2.f")), PIIC stated:

> [T]he cause of the loss is related to a pipe freeze and burst resulting
> from improperly maintained heat in the Building; therefore, we

regret to advise that a Covered Cause of Loss has not occurred, as defined in the contract, as outlined in the investigative details stated above.

(ECF No. 41-3 at 3; <u>see</u> ECF No. 37-1 at 6 ¶ 23).

### 4.  **Repair or Replacement**

After the Loss, Big V "did not repair or replace the" Building, (ECF No. 37-1 at 10 ¶ 47), but only took "it down to the studs to stabilize the [B]uilding."  (ECF No. 36-1 at 173).   In December 2019, Big V finalized an agreement to lease the Building to a franchise of Taco Bell. (ECF Nos. 36-1 at 213; 36-15; 37-1 at 11 ¶ 48).  Under the lease, Taco Bell agreed to build out and replace the interior of the Building according to its own plans and at its own expense.  (ECF Nos. 36-1 at 214–17; 37-1 at 11 ¶ 49).

Big V engaged Strongwater Group Services ("Strongwater"), to prepare an "estimate and appraisal to restore and refinish the [Building] to its pre-casualty condition, which were damaged by PIPE BREAK [sic][.]"  (ECF No. 36-2 at 2 (the "Strongwater Report")).  The Strongwater Report, dated March 14, 2019, estimated the cost to restore the Building was $480,578.67.  (<u>Id.</u>)  Michael Rubino, who prepared the Strongwater Report, visited the Building once, after it had already been gutted, and reviewed the drawings of the Building prepared by the Bank.  (ECF No. 36-1 at 156–58).

### 5.  **Elias Josephs Deposition**

On January 30, 2020, Big V's representative, Eli Josephs ("Josephs") was deposed (the "Josephs Deposition")).  (ECF Nos. 36-1; 37-1 at 7 ¶ 29).  Josephs testified that, before the Loss, the interior of the Building "looked nice" and contained "cabinets" and "fixtures" suitable for a bank.  (ECF No. 36-1 at 147).  Josephs testified that he would check on the Building once per

week, but that he did not monitor whether the Building was, in fact, heated during the fall and winter of 2018 and was not aware that heat was off. (Id. at 85–90; 37-1 ¶ 30). Josephs testified that no one monitored the Building's utility bills. (ECF Nos. 36-1 at 199; 37-1 at 7 ¶ 31). During the eleven-month period leading up to the Loss, Josephs did not drain the pipes or shut off the water supply to the Building. (ECF Nos. 36-1 at 126; 37-1 at 8 ¶ 32).

### 6. Expert Reports

#### a. Rudi Sherbansky

Big V retained Rudi O. Sherbansky ("Sherbansky") to serve as an expert with respect to the Loss. (ECF Nos. 37-1 at 7 ¶ 24; 39-2). Sherbansky received a bachelor's degree in civil engineering from the University of Ottawa and an MBA from New York University Stern School of Business, and has attended and delivered numerous continuing education and training seminars in engineering over the past 30 years. (ECF No. 39-6 at 7–8). Since 1991, he has been a licensed professional engineer, and is a member of the New York State Society of Professional Engineers. (Id. at 8). His experience includes working for three different engineering firms in New York City, and since 2011, he has been a senior consultant as ASPA Engineering LLC, conducting forensic examinations of defective building construction and building compliance with governmental codes and regulations and providing engineering consulting services to residential and commercial landlords, developers, and others. (Id. at 3–7). In the past nine years, he has been admitted as a professional engineering expert witness in New York State Supreme Court in Richmond and Queens Counties, and in a mediation and arbitration hearing. (Id. at 2). In addition, he has "[p]repared several dozens of property evaluation reports, which were filed and approved by the NYS Attorney General and published in public offering plans of cooperative

and condominium building conversion projects throughout New York City and the vicinity." (Id.
at 8).

Following a March 27, 2019 inspection of the Building, Sherbansky issued a report dated
April 4, 2019 regarding the cause of the Loss. (See generally ECF No. 39-2 (the "Sherbansky
Report")).[5] During his inspection, Sherbansky observed that the "pipe leak occurred at a welded
elbow joint of a 1/2" inch copper pipe that was supplying water to the humidifiers attached to
two (2) forced-air HVAC units of the building." (Id. at 3–4). Sherbansky opined that "[t]he cause
and origin of the water leak was from a latent defect in a pitted copper pipe joint or fitting which
was connected and soldered in an inferior manner, causing the pipe to disconnect at the joint
suddenly and without any warning, resulting in the subject flood and water damage throughout
the [B]uilding." (Id. at 5–6). He "observed the solder at the separated joint to be only about 1/4"
inch in width, whereas solder copper pipe joints are typically 1/2" inch to 3/4" inch in width and
bleed out of the joint." (Id. at 6). He also observed that the "solder [] at the separated joint is
non-uniform and doesn't completely extend and bleed out to the end of the fitting, causing
separation to show between the pipe and fitting when being assembled together." (Id.)
Sherbansky asserted that "[t]his inferior pipe soldering substantially causes pin holes to develop
at the subject elbow joint and the eventual separation of the joint." (Id.)

Sherbansky also "observed surface pitting corrosion and white acidic dust initiated on the
interior/water side of the elbow pipe joint[,]" which "is a non-uniform localized attack of the
copper tube wall or fittings initiated on the inside surface of copper water pipes and is caused

---

[5] The parties submitted two copies of the Sherbansky Report, one with respect to the Daubert Motion
(ECF No. 39-2), and one with respect to the MSJ (ECF No. 36-11). For simplicity, the Court cites only to the
copy filed with the Daubert Motion, ECF No. 39-2.

among others [sic] by water hardness or the chemistry of the water." (ECF No. 39-2 at 6).  Based on his observations, Sherbansky "concluded that the pipe leak occurred due to a latent condition of the pipe joint that disconnected suddenly and without any indication of being defective." (Id. at 6).  He ruled out freezing conditions as a cause of the pipe leak "because there were no symptoms or other indications that freezing occurred in the HVAC pipes which [sic] would cause such a pipe burst[.]" (Id. at 6–7).  Symptoms of freezing include cracking, bubbling, warping, displacement, sagging, or other "pipe bursting condition[,]" but he did not observe any of these symptoms. (Id. at 7–8).  Sherbansky noted that the pipe, which was attached to the ceiling of the HVAC room, was "aligned plumb, straight with no bulging, [or] movement[,]" and that the HVAC room was "typically the warmest part of the building." (Id. at 7).

In preparing his Report and reaching his opinions and findings, Sherbansky conducted a site visit to the Building, reviewed certificates of occupancy and compliance for the Building, reviewed building permits, photographs, and weather reports, and visited the New Windsor Department of Buildings to search for public records of violation notices and other records relating to the Building. (ECF No. 39-2 at 9).

On September 23, 2021, Sherbansky was deposed (the "Sherbansky Deposition")). (ECF Nos. 36-7; 37-1 at 8 ¶ 34).  Sherbansky acknowledged that freezing temperatures occurred on a total of fourteen days in December, before and on December 19, 2018, and that freezing temperatures "[c]ould create conditions" in which water pipes were susceptible to freezing. (ECF Nos. 36-7 at 52–53; 37-1 at 8 ¶ 35).  Sherbansky acknowledged that the Building's utility records showed no electricity or gas usage for at least six months before the Loss, and that the Building's pipes had not been drained and contained standing water. (ECF Nos. 36-7 at 54, 83–84; 37-1 at

8 ¶¶ 37–38).  Sherbansky testified that an "ice plug" in a pipe "forms radially, it expands radially,

not longitudinally[,]" and "might" cause a "slight increase" in the pressure with in the pipe, such

that "the first damages would occur at the weakest link, which is radially at the location that the

pipe freezes."  (ECF Nos. 36-7 at 64–66; 37-1 at 9 ¶¶ 39–40).  He later testified that the pressure

from the ice plug was "insignificant" at the elbow joint where the pipe actually separated.  (ECF

No. 36-7 at 85–86).  Sherbansky acknowledged that "[i]n coming to [his] conclusions, [he] did not

perform any type of testing analysis . . . ."  (ECF No. 36-7 at 72).  He acknowledged that he

performed his inspection on March 27, 2019, approximately three months after the Loss, and

that he neither took any portion of the pipe with him nor knew its present location.  (Id. at 74;

37-1 ¶¶ 42–43).

### b.  James Davis

Davis submitted, on behalf of PIIC, an expert report dated September 17, 2021.  (ECF

Nos. 36-13 (the "Davis Report"); 37-1 at 7 ¶ 26).  Davis obtained a civil engineering degree from

West Point and a masters degree in civil and environmental engineering from Massachusetts

Institute of Technology.  (ECF No. 36-13 at 11).  He has a professional engineering license in

18 states, including New York.  (ECF Nos. 36-15 at 11; 47-8 at 37).  After serving as a structural

design engineer in the United States Army, Davis worked as a structural design engineer and

forensic engineer for two firms, including EDT, before joining, in April 2019, J.S. Held Engineering

Services.  (ECF No. 36-13 at 3, 11–12).  Over the last six years, Davis has testified as an expert in

trials, hearings, and arbitrations.  (ECF No. 36-13 at 12–13).  He has been involved in 15–20 prior

cases involving disputes about whether a pipe had frozen.  (ECF No. 47-8 at 45).

Davis concluded that "[s]ome force is necessary for a pipe joint to rupture in the manner that occurred at the [] [B]uilding."  (ECF No. 36-13 at 6).  Davis explained that the undisputed facts that (1) the pipe was in an uninsulated attic space; (2) the Building was vacant and unheated before the Loss; and (3) sub-freezing temperatures occurred leading up to and on the date of the Loss, "support that a pipe freeze occurred at the [] [B]uilding."  (Id. at 7).  Davis criticized Sherbansky for failing to address these undisputed facts, and noted that, "the reported vulnerability of the joint in question, if true, does not explain **why** the pipe ruptured, but rather **where** the pipe ruptured."  (ECF No. 36-14 at 7).  Davis maintained his conclusion from the EDT Report that "[t]he separation of a pipe joint along a water supply pipe of the [] [B]uilding was the result of water freezing within the pipe on, or about, December 19, 2018."  (ECF No. 36-13 at 7).

In preparation of his Report, Davis relied on his January 31, 2019 inspection of the Building, and review of the EDT Report, weather records, utility records, Josephs' Deposition, HVAC maintenance records, and two articles about pipe freezes.  (ECF No. 36-13 at 3–8).  He did not perform any testing during his inspection of the Building, and did not remove or take with him any section of the pipe.  (ECF No. 47-8 at 86).

On October 21, 2021, Davis was deposed.  (ECF No. 47-8 ("Davis Deposition")).  Davis testified that, on the date he inspected the Building, "all the interior piping from the floor to the ceiling ha[d] been removed[,]" such that he was unable to discern how water flowed into the Building and up to the attic space where the HVAC units were located.  (ECF No. 47-9 at 9–10).  The piping in the attic, however, "remain[ed] intact and that's where the separation occurred."  (Id. at 10).  When asked why, if there were fourteen days of sub-freezing temperatures before December 19, 2018, the pipes did not freeze earlier, Davis noted that December 19, 2018 was

"the date of discovery, not necessarily the date of loss," and the pipe burst could have occurred "on or before that date," and it was "possible that some freezing did occur" before December 19, 2018.  (Id. at 23–26).  He also noted that "[t]he nature by which water freezes within a pipe is not a sudden event" but is "a multi-stage process[.]"  (Id. at 26).  He explained that a pipe freeze occurs "because you have an ice plug within the pipe itself[,]" and the ice plug, "because of its expansive nature, pushes water downstream resulting in the pipe rupture."  (Id. at 27).  He acknowledged research showing that uninsulated attic space "will be on average three degrees warmer than the exterior temperature[,]" and that, "just because you have a 17 or 20 degree temperature" does not mean "a pipe is going to freeze at that given time."  (Id. at 29–30).  Still, Davis asserted that the "pipes that are in the uninsulated space are much more prone to freezing than any pipe located in the lower level or the attic space of the HVAC room."  (Id. at 35–36).  In his inspection, he noted another pipe running through the uninsulated space that did not rupture, but noted that that pipe "appeared to have better pipe insulate wrap" and did not have the "inherent weakness" that made the pipe that did burst "more prone to freezing than others that were in a similar location."  (Id. at 36–37).  Davis testified to his opinion "that an ice plug formed in the section of the pipe somewhere between the insulated ceiling space and the insulated wall of the HVAC room where that pipe is routed through the uninsulated space, somewhere along [the] vertical leg or the horizontal leg[.]"  (Id. at 54, 63).

**B.  Procedural Background**

On April 16, 2019, Big V filed a summons and complaint against PIIC in New York State Supreme Court, Rockland County.  (ECF No. 1-1).  On May 10, 2019, PIIC removed the action to this Court.  (ECF No. 1).  After completing discovery, on February 11, 2022, PIIC filed both

Motions.  (ECF Nos. 35; 38).  On March 11, 2022, Big V filed oppositions to both Motions.  (ECF

Nos. 46–47).  On March 18, 2022, PIIC filed its replies.  (ECF Nos. 48–50).  Judge Daniels has

referred both Motions for this report and recommendation.  (ECF No. 32).

### III.  DISCUSSION

Resolution of the MSJ turns, at least in part, on resolution of the Daubert Motion.

Accordingly, the Court begins with the latter.  See Phila. Indem. Ins. Co. v. Streb, Inc., 487 F. Supp.

3d 174, 182 (S.D.N.Y. 2020) (addressing Daubert motion before summary judgment motion).

### A.  Daubert Motion

#### 1.  Legal Standard

Federal Rule of Evidence 702 provides that "[i]f the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue," a witness "who is qualified as an expert by knowledge, skill, experience, training,

or education may testify in the form of an opinion or otherwise . . ."  Fed. R. Evid. 702.  While

Rule 702 "embodies a liberal standard of admissibility for expert opinions," Nimley v. City of N.Y.,

414 F.3d 381, 395 (2d Cir. 2005), the trial court must "ensure that 'any and all scientific testimony

or evidence admitted is not only relevant, but reliable.'"  Id. at 396 (quoting Daubert, 509 U.S. at

589).  "Despite the Second Circuit's inclusive standard for expert testimony, a trial court should

not abandon its gatekeeping role and rely only upon cross-examination to expose any flaws in a

proposed expert's testimony where the expert's methodology is untestable."  Faryniarz v. Nike,

Inc., No. 00 Civ. 2623 (NRB), 2002 WL 1968351, at *2 (S.D.N.Y. Aug. 23, 2002) (citing Colon v. BIC

USA, Inc., 199 F. Supp. 2d 53, 78 (S.D.N.Y. 2001)).  Thus, "[e]xpert testimony cannot be based on

an expert's unfounded assertion[,]" and, if "based on scientific or technical principles, [] must be testable." Faryniarz, 2002 WL 1968351, at *2.

In the context of a motion to exclude expert testimony, "'[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.'" Karnauskas v. Columbia Sussex Corp., No. 09 Civ. 7104 (GBD), 2012 WL 234377, at *6 (S.D.N.Y. Jan. 24, 2012) (quoting Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), aff'd, 522 U.S. 312 (2008)).  The expert may base his opinion on experience alone provided he "'explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliable applied to the facts.'" Henry v. Champlain Enters., Inc., 288 F. Supp. 2d 202, 220 (N.D.N.Y. 2003) (quoting Fed. R. Evid. 702, Adv. Cmte. Notes (2000 amend.)).

In Daubert, the Supreme Court articulated four factors for the trial court to consider in determining the reliability of an expert's opinion:  "(1) whether the theory or technique relied on has been tested; (2) whether the theory or technique relied on has been tested; (2) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted in the scientific community." Karnauskas, 2012 WL 234377, at *7 (citing Daubert, 509 U.S. at 593–94).  "The factors should be applied flexibly, according to the particular circumstances of the case at issue[,]" Karnauskas, 2012 WL 234377, at *7 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)), and in general, "'rejection of expert testimony [has been] the exception rather than the rule.'" Henry, 288 F. Supp. 2d at 220 (quoting Fed. R. Evid. 702, Adv. Cmte. Notes (2000 amend.)). "The [C]ourt must 'make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" <u>Karnauskas</u>, 2012 WL 234377, at *7 (quoting <u>Kumho</u>, 526 U.S. at 152).

### 2. Application

PIIC moves to exclude both the Sherbansky Report, as well as his testimony. (ECF No. 40 at 13–28). The Court considers each in turn.

#### a. Sherbansky Report

PIIC argues that the Sherbansky Report should be excluded because it is "speculative or conjectural" in four respects: (1) Sherbansky "does not explain why he was able to conclude that the pipe disconnected 'suddenly' as opposed to gradually or in some other way"; (2) he performed "no tests" or "calculations to determine the physical conditions of the pipe and the building during the subfreezing weather conditions leading up to and including the date of [L]oss" or "take any measurements or perform any calculations based on the size and structure of the building to determine if the attic of <u>this particular building</u> was in fact 'the warmest part of the [B]uilding' and did not incorporate his review of widely available weather records to support his conclusion"; (3) his failure to inspect any other pipes in the Building undermines his assertion that "since no other pipe in the [B]uilding froze, this one did not also"; and (4) he failed to "discuss the year-long building vacancy, lack of heat, or freezing weather conditions leading up to and including the date of loss[,]" or review the utility records. (ECF No. 40 at 16–20). In short, PIIC challenges not Sherbansky's qualifications, but rather, his methodology (or lack thereof).

Big V responds that, to the extent PIIC criticizes Sherbansky for failing to address "'what force actually pushed the fitted pipe sections apart[,]'" neither did PIIC's expert, Davis, "address

this question either and, in fact, testified that it would be 'impossible' to determine what amount of force would be necessary to separate the pipe at the elbow joint."  (ECF No. 46 at 18 (quoting ECF No. 46-3 at 57)).  Big V maintains that Sherbansky <u>did</u> consider freezing as a potential cause of the pipe burst, "but ruled it out based upon the absence of any evidence characteristic of a pipe freeze."  (ECF No. 46 at 18).  Big V describes Sherbansky's scientific method as "looking for characteristic signs of a freeze, such as bulging or warping," but neither he, nor Davis, found any such signs.  (<u>Id.</u> at 19).  As to testing, Big V notes that Davis performed no testing either, and, in any event, Sherbansky observed, based on his experience, "inferior soldering of the elbow joint, which is ultimately what led the pipe to separate."  (<u>Id.</u> at 20 (citing ECF No. 39-1 at 129–30)).  Big V maintains that, given the similarities between Sherbansky's and Davis' methodologies, neither party's expert should be excluded.  (ECF No. 46 at 20).

As noted above, PIIC does not dispute that Sherbansky is qualified to give expert testimony in this case, and the Court agrees that, as a licensed professional engineer with decades of experience in building systems, he has the requisite knowledge to support his opinions.  <u>See</u> <u>Tawadros v. Allstate Ins. Co.</u>, No. 18 Civ. 1002 (NAM) (TWD), 2020 WL 3574642, at *7 (N.D.N.Y. July 1, 2020) (finding that licensed professional engineer was qualified to opine on cause of pipe freeze).

As to PIIC's challenge to the reliability of the opinions in the Sherbansky Report, however, the Court finds his opinions sufficiently reliable and non-speculative to be considered at this time.  First, the opinions in the Sherbansky Report are supported by his own inspection of the Building in the context of his decades of experience in building systems.  (ECF No. 39-2 at 3–4, 9, 11–12).  <u>See</u> <u>Bocoum v. Daimler Trucks N. Am. LLC</u>, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *11

(S.D.N.Y. Mar. 28, 2022) (permitting expert's opinion, based on his observations and experience, as to cause of physical damage to vehicle). That first-hand inspection revealed the <u>absence</u> of any of the typical "symptoms or other indications that freezing occurred in the HVAC pipes [that] would cause such a pipe burst," symptoms with which he was familiar due to his experience as a licensed professional engineer. (ECF No. 39-2 at 7). Indeed, Davis conceded that he "had personally never investigated a situation where [he] would attribute a pipe separation of this nature to a frozen pipe[,]" and that he did not observe in the Building the "fish mouth" more commonly observed in pipe freezes. (ECF No. 46-3 at 71, 76, 79).

Second, the Court's conclusion that Sherbansky's methodology was reliable is reinforced by the similarity of Davis' methodology, at least insofar as both experts relied principally on their inspection and experience and neither conducted any computer modeling, calculations, or chemical testing. (<u>Compare</u> ECF No. 39-2 at 9 <u>with</u> ECF No. 36-13 at 7–8). While the Court can envision additional testing Sherbansky—and Davis, for that matter—<u>could</u> have done, the fact that Davis did no such testing here undermines PIIC's complaints about Sherbansky's approach. <u>C.f.</u> <u>Tawadros</u>, 2020 WL 3574642, at *8 (noting that expert had performed computer modeling to determine whether freezing conditions caused pipe to burst). And PIIC points to no legal authority suggesting that such testing is <u>required</u> to analyze the cause of a burst pipe, nor has the Court's independent research located any.

Third, PIIC's criticism of Sherbansky for failing to inspect any other pipes in the Building falls short for the similar reason, that Davis did not do so either, most obviously because there was no evidence of any other water leaks in the Building suggestive of a burst pipe that would

have required further inspection.  See Nationwide Mut. Fire Ins. Co. v. Sunbeam Prod., Inc., No.

12 Civ. 6594 (AT), 2014 WL 3875844, at *5 (S.D.N.Y. July 17, 2014).

Fourth and finally, to the extent PIIC criticizes Sherbansky for failing to review utility bills

or address the Building's vacancy in the year before the Loss, the Court finds that this argument

is "better suited for cross-examination."  Tawadros, 2020 WL 3574642, at *8.

Accordingly,  the  Court  respectfully  recommends  that  PIIC's  motion  to  preclude  the

Sherbansky Report be DENIED.

### b. Sherbansky's Testimony

PIIC seeks to exclude Sherbansky's testimony for essentially the same reasons as his

Report, i.e., that it contains "untested and conjectural conclusion regarding the inferiority of the

solder on the pipe joint" but "fail[s] to explain why the pipe separated."  (ECF No. 40 at 27).  PIIC

suggests that Sherbansky's testimony "contains a blatant contradiction in logic" to the extent he

suggested that the pipe joint "was insufficiently capable of resisting the standing water within

the pipe, but sufficiently capable of resisting any increase in water pressure from freezing[,]" (id.

at 25), and that "he does not understand how water freezes in a pipe."  (ECF No. 48 at 10).  Big V

rejects PIIC's criticism as a mischaracterization of Sherbansky's testimony, pointing out that PIIC

has not offered any evidence of an "increase in water pressure within the pipe[.]"  (ECF No. 46 at

21).  Big V adds that Sherbansky did consider weather conditions, and neither he nor Davis

performed any metallurgical testing on the pipe.  (Id. at 20–21 (citing ECF Nos. 36-7 at 98; 46-3

at 57–59)).

The Court finds that PIIC has not met its burden to show that Sherbansky's testimony

should be excluded at this time.  Rather, PIIC's criticisms of Sherbansky's testimony "go to the

weight of [his] testimony, not its admissibility, and are properly addressed through cross-examination." Boyce v. Weber, No. 19 Civ. 3825 (JMF), 2020 WL 5209526, at *1 (S.D.N.Y. Sept. 1, 2020); see Discepolo v. Gorgone, 399 F. Supp. 2d 123, 129 (D. Conn. 2005) ("Defendant's cross-examination can effectively reveal to the jury inaccuracies, imprecisions, or fallacies in [the expert's] analysis to enable the jury to decide how much of [the expert's] testimony to credit or not credit, and what weight to give it in the context of all the evidence . . ."). The Court agrees with Big V that Sherbansky's testimony is sufficiently supported by his experience and inspection, which did not find any of the typical symptoms of a pipe freeze, and any challenges to his conclusion that the pipe did not freeze are best addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]" Daubert, 509 U.S. at 596. The Court therefore also respectfully recommends that PIIC's motion to exclude Sherbansky's testimony be DENIED.

## B.  Motion for Summary Judgment

### 1.  Legal Standard

"Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Karnauskas, 2012 WL 234377, at *2 (quoting Fed. R. Civ. P. 56(c)); see Vacold LLC v. Cerami, 545 F.3d 114, 121 (2d Cir. 2008). PIIC bears the burden of showing that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only where it will affect the outcome of the suit under governing law." Karnauskas, 2012 WL 234377, at *2 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "For there to be a 'genuine' issue

about that fact, the evidence must be such 'that a reasonable jury could return a verdict for the nonmoving party.'" Karnauskas, 2012 WL 234377, at *2 (quoting Liberty Lobby, 477 U.S. at 248). In determining whether a genuine issue of material fact exists, the Court resolves all ambiguities and draws all inferences in favor of BIG V. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). In the absence of evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is appropriate. Catlin v. Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996).

**2. Application**

PIIC argues that it is entitled to summary judgment on three grounds: (1) Big V has not established a covered cause of loss; (2) Big V did not incur an actual loss; and (3) Big V violated a condition precedent to coverage. (ECF No. 37 at 17–28). Because the parties dispute the burden of proof on these issues (compare id. at 17–21 and ECF No. 49 at 6–7 with ECF No. 47 at 12–14), the Court first determines who bears the burden of proof before turning to PIIC's arguments.

**a. Burden of proof**

"In determining a dispute over insurance coverage, [courts] first look to the language of the policy[.]" Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 221 (2002). "It is the well-settled law of [New York] that if an insurance policy or a clause thereof is reasonably susceptible to two different constructions, the one most favorable to the insured must be adopted." Goldner v. Otsego Mut. Fire Ins. Co., 39 A.D.2d 440, 442 (3d Dep't 1972) (citing Tonkin v. Calif. Ins. Co., 294 N.Y. 326, 328 (1945)). "Since the insurer is the author of the policy, its provisions must be strictly construed against the insurer and all ambiguities in terminology must

23

be resolved in the insured's favor so long as such a construction would neither be strained nor unnatural." Id. (citing Silverstein v. Comm'l Cas. Ins. Co., 237 N.Y. 391, 393 (1924)).

New York courts have recognized that, while "the insurer has the burden of proving the applicability of an exclusion[,]" an insured bears the "burden to establish the existence of coverage[.]" Corbel Constr. Co. v. Arch Spec. Ins. Co., 160 A.D.3d 703, 704 (2d Dep't 2018); see Clark Moving & Storage, Inc. v. Selective Ins. Co. of Am., No. 07 Civ. 6420, 2010 WL 3420453, at *8 (W.D.N.Y. Aug. 27, 2010) ("The insurer bears the burden of demonstrating that coverage under the subject insurance policy is excluded").   Thus, where "the existence of coverage depends entirely on the applicability of [an] exception to the exclusion, the insured has the duty of demonstrating that it has been satisfied[.]" Borg-Warner Corp. v. Ins. Co. of N. Am., 174 A.D.2d 24, 31 (3d Dep't 1992).   In the context of the MSJ then, PIIC must "establish[] its prima facie entitlement to judgment as a matter of law by demonstrating the applicability of an exclusion in [the] [P]olicy[,]" and then Big V must "raise a triable issue of fact regarding the applicability of an exception to the exclusion[.]" Corbel, 160 A.D.3d at 704–05.

**b.   Causation**

As set forth above, the Policy excludes coverage of water damage (i) "caused by or resulting from freezing," unless (ii) Big V did its "best to maintain heat" in the Building, or (iii) Big V drained the pipes and shut off the water supply to the Building.  (ECF Nos. 37-1 at 2–3 ¶ 5; 41-1 at 9).  Although it is undisputed that Big V neither maintained the heat in the Building nor drained the pipes and shut off the water supply (ECF No. 37-1 at 6 ¶ 19), as set forth below, genuine issues of material fact as to whether the water damage was "caused by or resulting from

freezing" demonstrate that PIIC is not entitled to judgment as a matter of law under the exclusion in paragraph 2.f of the Policy.

First, PIIC's position is premised on its argument that the Court should exclude Sherbansky's Report and testimony (ECF No. 37 at 18–19), which, for the reasons set forth above, the Court recommends be denied.

Second, PIIC argues that even if the pipe had been soldered in an inferior manner, "such proof does not explain why the pipe separated." (ECF No. 37 at 19). But this argument misconstrues the burden of proof: it is PIIC's burden to prove that the exclusion in 2.f applies in the first instance by proving that freezing caused or resulted in the Loss. Corbel, 160 A.D.3d at 704 ("the insurer has the burden of proving the applicability of an exclusion"). While PIIC has offered Davis' opinion that a pipe freeze occurred, Big V has come forward with Sherbansky's opinion that the cause was poor soldering. Just because PIIC has offered Davis' opinion does not conclusively establish freezing as a cause, given that he and Davis agree that the typical symptoms of a frozen pipe are absent, and neither did any further testing or calculations to provide further confirmation one way or the other. Rather, the differences between Sherbansky's and Davis' opinions about the cause of the water damage "create[] an issue of fact as to causation." See Tawadros, 2020 WL 3574642, at *9 (denying summary judgment where parties' experts presented opposite conclusions about cause of burst pipe). A reasonable jury could find that the Loss was not "caused by or result[ed] from freezing[,]" and therefore, would be covered under the Policy. (ECF No. 41-1 at 9).

Third, if PIIC is correct that, "[i]f the water was discharged because of pipe freeze, it is excluded by operation of exclusion 2.f[,]" (ECF No. 37 at 20), the inverse is also true – if a pipe

freeze did <u>not</u> cause the water damage, exclusion 2.f does not apply, and PIIC must provide coverage.

Finally, even if the Loss were caused by freezing, such that the exclusion in paragraph 2.f applied, Big V has invoked the exception in paragraph 3.c, pursuant to which PIIC "will pay" where a "'**loss**' by a Covered Cause of Loss results[.]" (ECF No. 41-1 at 11; <u>see</u> ECF No. 36-14 at 2). The Court finds the awkward wording of paragraph 3.c—the words "by" and "results" rendering the cause and effect and which "loss" PIIC will or will not pay for unclear—to suggest at a minimum, an ambiguity that must be construed against PIIC for purposes of deciding summary judgment. <u>See</u> <u>Goldner</u>, 39 A.D.2d at 442. In any event, Sherbansky's opinion that an "inferior" solder on the elbow joint of the burst pipe (ECF No. 39-2 at 6), makes it an open question as to whether paragraph 3.c's exception to the exclusion in paragraph 2.f applies, thus also precluding summary judgment for PIIC.

### c.  <u>Proof of loss</u>

Where there is a covered loss, the Policy provides that, once the Building "is actually repaired or replaced," PIIC will pay the lesser of (i) the Policy limit; (ii) the cost to replace the Loss; or (iii) that amount Big V actually spent to repair or replace the Loss. (ECF No. 41 at 140). PIIC argues that, to recover under the Policy, Big V was required, but has failed, to prove an actual loss, because Big V has not provided evidence of the Building's interior pre-December 18, 2018, nor did it expend any amount to repair or replace the Building. (ECF Nos. 37 at 22–27; 49 at 10–11). Big V acknowledges that is not seeking replacement value of the Building, but argues instead that it has supplied sufficient evidence of the actual cash value, relying on the combination of Joseph's testimony, the MSW Report, and the Strongwater Report. (ECF No. 47 at 15–16).

The Court interprets PIIC to be arguing first, that Big V did not have an insurable interest in the Building (ECF Nos. 37 at 26–27; 49 at 10), and second, even if Big V had such an interest, it has failed to adduce sufficient evidence to create a genuine issue of material fact as to the actual cash value recoverable under the Policy.  (ECF Nos. 37 at 23–25; 49 at 11–12).  The Court analyzes each issue in turn.

### i.      Insurable Interest

New York law "requires that the named insured have an insurable interest in the subject matter of the policy of insurance[.]"  Citizens Sav. & Loan Ass'n of N.Y. v. Proprietors Ins. Co., 78 A.D.2d 377, 379 (3d Dep't 1981).  New York Insurance Law provides that an "insurable interest" is "any lawful and substantial economic interest in the safety or preservation of property from loss, destruction or pecuniary damage."  N.Y. Ins. L. § 3401.  The Second Circuit has recognized that § 3401 "require[s] an insurable interest at the time of the loss in cases involving property or casualty insurance."  Herman v. Provident Mut. Life Ins. Co., 886 F.2d 529, 534 (2d Cir. 1989).  "Generally, a party possesses an insurable interest in the subject matter which is insured where he has such a relation or connection with, or concern in, such subject matter that he will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction, termination, or injury by the happening of the event insured against[.]"  Nat'l Superlease Inc. v. Reliance Ins. Co. of N.Y., 123 A.D.2d 608, 608 (2d Dep't 1986).

Here, it is undisputed that "Big V purchased the [B]uilding in 2014 and assumed the lease" to the Bank.  (ECF No. 37-1 at 4 ¶ 7).  As the owner of the Building, Big V "had a substantial economic interest in" its preservation.  Counihan v. Allstate Ins. Co., 25 F.3d 109, 112 (2d Cir. 1994); see Porter v. State Farm Fire & Cas. Co., No. 14 Civ. 511A (SR), 2015 WL 12911468, at *4

(W.D.N.Y. June 25, 2015) (holding that sole owner of property at time of loss "possesse[d] an insurable interest in the property"), adopted by, 2015 WL 12911469 (W.D.N.Y. July 24, 2015); cf. Diamond State Ins. Co. v. Hidalgo, No. 20 Civ. 1340 (ENV) (CLP), 2021 WL 7906545, at *6 (E.D.N.Y. July 23, 2021) (holding that owner's insurable interest terminated when he transferred ownership of the insured property).  Although the Building was vacant at the time of the Loss, Big V, as the owner, possessed a "'pecuniary benefit' . . . in the property itself that was at risk when the [Loss] occurred."  Counihan, 25 F.3d at 112.  Accordingly, the Court rejects PIIC's argument that Big V did not possess an insurable loss in the Building at the time of the Loss.

### ii.  **Actual Cash Value**

The Court also rejects PIIC's contention that Big V has failed to adduce sufficient evidence to recover the actual cash value of the Loss.  To carry its burden of proving damages, Big V must ultimately "show by a preponderance of the evidence that it has suffered damages."  Olin Corp. v. Lamorak Ins. Co., 332 F. Supp. 3d 818, 856 (S.D.N.Y. 2018).  In opposing the Motion, however, Big V must only "proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material" as to damages.  Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).  To defeat the MSJ, Big V "need not, however, prove the exact amount of [its] damages."  Zurich Am. Life Ins. Co. v. Nagel, No. 20 Civ. 11091 (JSR), 2022 WL 759375, at *9 (S.D.N.Y. Mar. 14, 2022); see Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 391 (2d Cir. 2006) ("[A] plaintiff need only show a 'stable foundation for a reasonable estimate,' of damages to which [it] is entitled as a result of the breach.") (quoting Contemp. Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977)).

The Court finds that Big V has met its burden of showing this "stable foundation for a reasonable estimate of damages" by invoking the provision of the Policy that provides for reimbursement of the actual cash value, the common measure of damages under a property insurance policy to which Big V is entitled even though Taco Bell ultimately refurbished the Building for its own use.  See Harrington v. Amica Mut. Ins. Co., 223 A.D.2d 222, 226 (4th Dep't 1996) ("Plaintiff would have been entitled to recover the actual cash value from defendant even if a third party had completed the repairs at no cost to plaintiff[.]").  Big V has also met its summary judgment burden by pointing to:  (i) Joseph's testimony as to the cabinets and fixtures in the Building before the Loss and subsequent demolition, (ECF Nos. 36-1 at 147; 47 at 16); (ii) the MSW Report, which followed an inspection that occurred one week after the Loss and described the conditions inside the Building, (ECF Nos. 37-1 at 5 ¶ 12; 41-2; 47 at 15); and (iii) the Strongwater Report estimating the value of the interior of the Building.  (ECF No. 36-2).  PIIC does not argue that any of this evidence is inadmissible, only that it is insufficient to establish the actual cash value.  (ECF No. 49 at 10–12).  As such, the credibility and weight to which this evidence is entitled is a question for the jury, and, accordingly, not appropriate for resolution on summary judgment.  See Zurich, 2022 WL 759375, at *10 (denying motion for summary judgment where plaintiffs "create[d] a genuine dispute of material fact" as to damages); Olin, 332 F. Supp. 3d at 858 (denying motion for summary judgment where there was "a genuine dispute of material fact as to how much [plaintiff] can recover in damages" under insurance policy); Clark Moving & Storage, 2010 WL 3420453, at *7 (denying summary judgment where material questions as to damages existed); V.S. Int'l, S.A. v. Boyden World Corp., No. 90 Civ. 4091 (PKL), 1993 WL 59399, at *8 (S.D.N.Y. Mar. 4, 1993) (same).

### d.  **Condition precedent**

PIIC's argument that Big V failed to satisfy a condition precedent to coverage is, essentially, a repackaging of its damages argument:  PIIC argues that Big V failed to maintain and provide an inventory of the items destroyed due to the Loss, and therefore, cannot prove its damages.  (ECF Nos. 37 at 28; 49 at 12).  To the extent PIIC is contending that Big V failed to cooperate under the Policy, PIIC "must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the insurer were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his or her cooperation was sought, was one of willful and avowed obstruction."  Allstate Ins. Co. v. United Int'l Ins. Co., 16 A.D.3d 605, 606 (2d Dep't 2005).  PIIC has failed to come forward with sufficient undisputed facts to establish any of these elements.  As Big V notes, the Policy only required it to supply an inventory at PIIC's request (ECF No. 37-1 at 11 ¶ 51), and neither of PIIC's denial letters contain such a request, nor is any evident elsewhere in the record.  (ECF Nos. 41-3; 47-7).  Further, PIIC cannot dispute that MSW—which PIIC engaged—recommended that the ceilings be removed and "all mitigation [] be completed" before further inspections by PIIC's engineers.  (ECF No. 41-2 at 5).  Thus, PIIC cannot characterize the "gutting" of the Building as any measure of obstruction by Big V.  PIIC has therefore failed to demonstrate the absence of a genuine issue of material fact as to whether Big V complied with a condition precedent to coverage under the Policy.

*       *       *

For the reasons set forth above, the Court finds that genuine issues of material fact concerning the cause of the Loss and Big V's damages preclude summary judgment in PIIC's favor, and, accordingly, respectfully recommends that the MSJ be DENIED.

### IV.  **CONCLUSION**

For the reasons set forth above, I respectfully recommend that PIIC's Daubert Motion and MSJ be DENIED.

Dated:      New York, New York
            August 5, 2022

SARAH L. CAVE
United States Magistrate Judge

\*                          \*                          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Daniels.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).